QUAKER OATS COMPANY,
Appellant,

v.

UNITED FRUIT COMPANY,
Appellee.

No. 15660.

United States Court of Appeals
Fifth Circuit.

March 16, 1956.

Malcolm W. Monroe, New Orleans, La., Deutch, Kerrigan & Stiles, René H. Himel, Jr., New Orleans, La., of counsel, for appellant.

John W. Sims, New Orleans, La., Phelps, Dunbar, Marks, Claverie & Sims, New Orleans, La., of counsel, for appellee.

Before BORAH, TUTTLE and JONES, Circuit Judges.

BORAH, Circuit Judge.

This is an appeal from a decree dismissing a libel in personam brought by appellant, the Quaker Oats Company, against United Fruit Company, a common carrier by water, to recover the sum of $3,000 for the alleged damage to 525 sacks of rolled oats while in the custody of the carrier awaiting shipment to Puerto Barrios, Guatemala.

The facts giving rise to the dispute are substantially these: On January 20, 1949, and according to customary procedure for shipment of Quaker Oats Company products,[1] 525 sacks of rolled oats

---

1. It was stipulated that: "The customary procedure in New Orleans, Louisiana, during the year 1949, for the movement of Quaker Oats Company shipments from the port of New Orleans on vessels controlled by United Fruit Company, was

packed in unlined jute or cotton bags and valued at $5.3675 per sack, were delivered by the Illinois Central Railroad to the carrier's Poydras Street wharf at New Orleans, Louisiana, pursuant to a "confirmation of cargo offering" issued to the shipper by the carrier's New York office and the shipper's directive requesting authorization to deliver the oats to the carrier. Both of the documents were stamped by the carrier's representatives "Deliver to A Steamer" [2] which, according to the uncontroverted testimony means that the carrier has no steamer, but if and when it has one, it will do everything possible to accommodate the cargo so accepted. When the cargo was delivered the carrier's representative signed and delivered to the railroad, the latter's form of receipts. The railroad forwarded the receipts to the shipper's New Orleans office, which in turn mailed them to its central office in New York, by reason of the fact that the local office only handled out going shipments upon receipt of advice and instructions from shipper's office in New York.

The railroad receipts contained the recital that they were issued in lieu of United Fruit Company standard form of dock receipt and were subject to the terms and conditions set forth in said dock receipt. These terms and conditions to the extent here pertinent were: that such goods were received by the carrier *"subject to delay and default in shipment caused by * * * labor disturbances,* lack of conveyances, room or facilities of any sort and the like," [3] and that:

"The United Fruit Company's regular bill of lading * * * shall be issued for said goods to the * * * shippers. *The United Fruit Company shall not become responsible for the goods as carrier until the goods are actually loaded on steamer; until such loading it shall be liable only for loss or damage occasioned by its fault, such as an ordinary bailee is liable for,* but subject also to the conditions, exceptions and limitations of liability and value contained in said regular bill of lading with which shippers are understood to have acquainted themselves and to assent to * * *."

The carrier's regular bill of lading to

---

for the Quaker Oats Company to obtain authorization from the proper representative of the United Fruit Company to move the prospective shipment to the carrier's wharf. In obtaining this authorization, the Quaker Oats Company used, and still uses, its own form called a 'Delivery Order' * * * and did not use the United Fruit Company form Dock Receipt, although the latter was and is used by some other shippers for this purpose.

"Subsequent to obtaining such authorization, the Quaker Oats Company would present to the New Orleans office of United Fruit Company multiple copies of the bill of lading, the original of the United States Export Declaration, and multiple copies of the Dock Receipt. If and when said anticipated shipment was allocated to a designated vessel, the bill of lading would be signed, and three originals and several nonnegotiable copies would be returned to the shipper, the time of such return depending primarily on whether the bill of lading is a 'received for shipment' or 'on-board' bill. The Dock Receipts were, and are, nev-

er returned to the Quaker Oats Company, and therefore, that company does not know whether or not the dock receipts are signed by the United Fruit Company or what disposition is ordinarily made of them.

"The New Orleans office of Quaker Oats Company did not and does not obtain any type of delivery receipt direct from the United Fruit Company covering its shipments. Instead, the Quaker Oats Company obtains from the railroad, which delivers the goods to the United Fruit Company wharf, the original of the railroad's form of receipt signed by a representative of the United Fruit Company * * * For this reason, the usual form Dock Receipt was not, and is not, executed by the United Fruit Company and returned to the New Orleans office of Quaker Oats Company * * *."

2. The full text of the stamp is as follows: "Deliver to A Steamer, Poydras St. Dock Sections 1 to 26, Track 3, Jan. 18 to 19, Unload account Railroad (x) Shipper ( ) No cargo received on Saturdays and holidays. United Fruit Company."

3. All italics herein ours.

which reference was made in the dock receipt expressly incorporated the provisions of the Carriage of Goods by Sea Act, 46 U.S.C.A. § 1301 et seq., all as more fully appears in Paragraph 1, the text of which is set forth in the margin.[4] Paragraph 4 of the bill of lading also provides that in a situation which, in the judgment of the carrier, is likely to give rise to risk of damage to or loss of any part of the cargo or to make it unsafe or imprudent to commence the voyage the carrier *may* before loading require the shipper to take delivery of the goods at port of shipment, and upon failure to do so, *may* warehouse the goods at the risk and expense of the goods.

Upon receipt of the cargo at carrier's enclosed wharf which was constructed of concrete and corrugated iron, the oats was stored on wooden pallets and was periodically inspected for pilferage or damage from leaks and water on the floor caused by high river or excessive rain, which, according to the uncontroverted evidence was the customary and usual procedure followed in the Port of New Orleans for handling such goods pending shipment. It is conceded that no particular vessel was ever designated for carriage of the shipment and no bill of lading was ever issued to the shipper because a labor slow-down at Puerto Barrios made it impossible for the carrier to obtain discharging berths at the foreign port. Also, that during the critical period when the oats was on the wharf, the weather in New Orleans was very warm and humid; in fact, the atmospheric conditions were optimum for the growth of mildew fungus.[5]

On February 18, 1949, twenty-nine days after the cargo was delivered to the wharf, a New Orleans representative of the shipper requested and received permission from the carrier to remove the cargo for the purpose of shipping it to destination via another carrier. Two weeks thereafter, and on March 7, 1949, the shipper's drayman arrived to remove the oats and, upon finding that the exteriors of the sacks were badly mildewed he refused to accept delivery. On March 24, the shipper had the cargo surveyed for its own account, and the surveyor reported that the damage was occasioned by "protracted storage of the sacks on the wharf," and that the mildewed condition rendered the oats unfit for human consumption, but suitable for animal feed. The cargo was thereafter removed from the wharf and sold as animal feed, bringing $790.30 net salvage.[6] Whereupon, the shipper duly demanded and was refused payment of damages and this libel in admiralty followed.

In the libel it was alleged that the carrier "neglected, failed and refused to issue a bill of lading covering the merchandise, and neglected, failed and refused to carry the merchandise as agreed and further negligently failed to give libelant notice within reasonable time that it did not intend to carry the shipment as agreed." It was further alleged that the oats mildewed, became unfit for the

4. "This bill of lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act * * * which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the carrier of any of its rights or immunities or an increase of any of its responsibilities or liabilities under said Act. *The provisions stated in said Act shall (except as may be otherwise specifically provided herein) govern before the goods are loaded * * * and throughout the entire time the goods are in the custody of the carrier * * *.*"

5. In January, 1949, the maximum temperature ranged from 36°F to 82°F which was 7°F higher than the normal temperature for that period, and the relative humidity at 6:30 a. m. was 88°, or 4° higher than the normal humidity of 84°. In February, 1949, the maximum temperature ranged from 42°F to 80°F, which was 5.2° higher than the normal temperature for that period, and the relative humidity at 6:30 a. m. was 91°, or 7° higher than the normal humidity of 84°.

6. Sale price of $914.29 less service and handling charge of $123.92.

purpose originally intended and seriously impaired in value "as a result of its undue and negligent storage on the wharf, all in violation of respondent's duties and obligations as a common carrier of goods by water for hire." The carrier denied that it was guilty of the acts of negligence charged. It pleaded the terms and conditions of its dock receipt and bill of lading, and alleged that "during the time that said merchandise described in the libel was in its custody * * * same was properly, carefully and efficiently stored and protected."

The issue thus joined, the cause came on for trial and at its end, the District Court concluded (1) that the carrier, having given libelant notice of the slowdown and suspension of service, it was not liable for either acceptance of the shipment or subsequent delay in loading; (2) that the standard form of dock receipt governs the relationship of the parties and under its terms the carrier is not liable for damages sustained by the oats due to delay in loading; (3) that the carrier whose relationship to the goods under the dock receipt was that of an ordinary bailee, was free of fault, and therefore was not liable for the loss; and (4) in the alternative, that if the Carriage of Goods by Sea Act does apply to the case, the carrier is not liable for loss or damage to the shipment because it at all times properly and carefully handled, stowed, kept, and cared for said shipment, and said loss or damage arose without the actual fault or privity of the carrier and without the fault or neglect of its agents or servants. The sole question presented on this appeal is whether the carrier negligently breached any duty owed appellant, and if so, whether such negligence caused the damage to appellant's cargo.

■ We agree with the District Court that the relationship of the parties was governed by the terms of the delivery receipt. This receipt provided that the cargo was accepted for delivery "to a steamer", and it incorporated by reference the stipulations in the dock receipt, that the merchandise was received "subject to delay in shipment caused by * * * labor disturbances," and that the carrier's liability prior to loading the merchandise on board was limited to that of an ordinary bailee, which limitation of liability was valid under both the Harter [7] and Carriage of Goods by Sea Acts and was not superseded by any provision of the carrier's bill of lading.

■ The parties having so contracted, we cannot say that the carrier was negligent in failing to issue a bill of lading, or in failing to load the cargo for shipment, because the delay resulting from the existence of the labor slowdown in the foreign port was specifically anticipated and excepted by them. Neither was the carrier liable for the oats while in its custody for the reason that the merchandise was properly stored on pallets in a well-ventilated wharf which amply protected it from the elements, and the kind of protection and inspection given the shipment fully complied with the appropriate standard of care that was due and owing. Appellant was cognizant of the inherent characteristics of its product, but notwithstanding this fact, it did not choose to contract for, and the carrier was not obliged to provide, storage space equipped with temperature and humidity controls. Rolled oats like other starchy foodstuffs are susceptible to mildew and mildew damage is not sudden, but is progressive after it has once begun. Here, the oats were delivered to the carrier in apparent good order and condition and the carrier's delay in loading for shipment under the weather conditions then prevailing set in motion the progressive cause of the damage, and it was that delay, not any failure of the carrier to exercise ordinary care, which was responsible for the damage. See United States Shipping Board Emergency Fleet Corp. v. Texas Star Flour Mills, 5 Cir., 12 F.2d 9.

Affirmed.

7.  46 U.S.C.A. § 190 et seq.